JUAN BAUTISTA RIVERA, Plaintiff and Appellant, *v.* WILLIAM C. DUNSCOMBE, Defendant and Appellee.

No. 10221.   Argued January 12, 1951.—Decided September 30, 1952.

*Felipe B. Montalvo* and *Buenaventura Esteves* for appellant.
   *J. Alemañy Sosa* for appellee.

MR. JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of
   the Court.

This is an action involving malpractice of medicine in
Puerto Rico.

Juan Bautista Rivera sued William C. Dunscombe,
physician and surgeon, for damages, alleging that the defend-
ant had been negligent in applying a caudal injection in the
treatment of an ailment which the doctor himself had diag-
nosed as sciatica. The alleged negligence consisted in that de-
fendant had not conformed to the standards of skill, care and
prudence ordinarily exercised in said cases by other physi-
cians and surgeons in good standing in the community; that

he failed to take an X-ray of the injured region in plaintiff's body in order to diagnose his ailment correctly and in not sterilizing the skin properly before giving the injection. According to plaintiff, the latter allowed the invasion of the infectious bacilli into his muscles and blood stream which, together with other infections caused by the burning of the tissues when the liquid spilled outside the sacral region produced an inflammation and infection of the muscles and tissues of said region for which reasons he had to submit to various operations.

In his answer, defendant denied the negligence charged on him and at the same time put the responsibility for any damages suffered, on plaintiff himself, for not following his instructions and treatment and for not remaining in the hospital.

After a trial on the merits the court *a quo* dismissed the complaint and plaintiff took an appeal from said judgment assigning to the trial judge the following errors (1) setting aside Dr. Antonio Ramos Oller's conclusion, who testified that the infection was necessarily introduced into plaintiff's body by an infected needle used by defendant when he gave the caudal injection, and in holding that said conclusion is not supported by the evidence and that it is in contradiction with the testimony of said expert; (2) in allowing, over plaintiff's objection, that defendant's witnesses, Alberto Velázquez and others testify on the treatment and technique that defendant employed with them in order to prove skill and care in the treatment of similar cases and (3) in acting with passion, prejudice and partiality in the weighing of the evidence and in rendering the judgment appealed from inasmuch as this was contrary to the facts and the law.

With regard to the facts that we are about to summarize there is no controversy, since they are amply supported by evidence.

On February 18, 1948, plaintiff went to defendant's clinic in the city of Mayagüez, requiring medical services from the latter and complaining of an excruciating pain in his left leg. After examining him, he diagnosed his ailment as sciatica applying an injection of 8cc. novocain at 2 per cent in 22cc. physiological saline solution in the sacral region. Plaintiff remained for some time in the rest room of the clinic and after paying defendant the amount of $15 for his services, returned to his home in San Sebastián driving his own truck. Once the effect of the injection had passed away, he felt the same pain again which continued increasing, this time radiating to his back. When he arrived at San Sebastián, he went to a local doctor who gave him sedatives. The pain however, became worse.

On February 20, about eight o'clock in the morning, plaintiff returned to defendant's clinic explaining what had happened. He was then submitted to diathermic treatments by applying hot compresses in the sacro lumbar region. He took certain sedatives given to him by defendant, later on he was given an injection of penicillin then one of morphine and later one of demerol. These two last injections were given for the purpose of soothing his pain. Being defendant's clinic one of consultation and first aid treatment only, without facilities or accommodations for hospitalization, he took plaintiff at about four or five o'clock in the afternoon of that day to Dr. Ramírez Quiles' hospital where he was hospitalized. There, by instructions of the defendant, treatment was continued. The pain, however, continued during that night and after trying to locate defendant, plaintiff left that hospital early next morning leaving for San Juan where he entered Pavía Hospital.

In said hospital a tentative diagnosis of sciatica and dislocation of the intervertebral disc was made. He was given sedatives until the 23rd. His blood and urine were analyzed, resulting the urinalysis with a three plus albumin and the

blood analysis with a four plus in the Wasserman reaction, the latter indicative of the fact that he suffered from syphilis. X-rays were taken of the lumbar region and were negative for dislocation of intervertebral disc whereupon the former diagnosis of dislocation of the disc was discarded. On February 25 another tentative diagnosis of perinephritic abscess was made. Finally on the 28th the patient was operated on by Dr. Ramos Oller, surgeon of Pavía Hospital, and a diagnosis of "lumbar abscess, post caudal anesthesia" was made. On March 3, Dr. Ramos Oller again operated on him making additional incisions on the same region and on the 23rd of the same month he underwent another operation. After these operations, plaintiff was under treatment in said hospital until April 1, when he was discharged. However he continued receiving treatment as an out patient. At the time this case was heard he was still under said treatment.

From December 10 to December 12, 1947—a little more than two months before the first visit to defendant—plaintiff received treatment in Díaz García Hospital, Pavía Hospital at present, for an ailment or pain in the waist near the back, which was diagnosed as lumbago and treated with penicillin injections and diathermy. On December 12, 1947, he was discharged.

In order to properly consider the errors assigned let us see which was, briefly, the evidence introduced by both parties in connection with the negligence charged on defendant.

Plaintiff offered, on said particular, his own testimony and that of Doctors Manuel Pavía Fernández and Antonio Ramos Oller, and in rebuttal, besides his own testimony again, that of Dr. Ramos Oller, of Dr. Emilio Vadi, and by stipulation as to the fact that he would testify as Dr. Vadi would, that of Dr. Juan Avilés.

Plaintiff's testimony was to the effect that on February 18, 1948, and while loading zinc from a warehouse at Maya-

güez, he felt an acute pain in the left leg and he was forced to see a doctor. Since defendant's clinic was nearby he went for a consultation. While there "he injected (sic) an injection in my back at the place where the spinal column ends." While defendant was injecting him he felt great pain in his back, on his right side as if "the skin were rising." Defendant took about five or six minutes in injecting him and did not disinfect the area of the flesh where plaintiff was injected. While injecting him, part of the liquid spilled.

Upon cross-examination he testified that in order to inject him they had placed him on his stomach, but that in spite of this he could observe when defendant "took the needle from a place, from an apparatus which he could not explain" what it was. He again affirmed that the area of the flesh where the injection was given had not been disinfected.

Dr. Manuel Pavía Fernández, Medical Director of Pavía Fernández Hospital in Santurce, stated that the last time that plaintiff was hospitalized there he complained of an acute pain in the right side of the lumbar region, which pain he had been feeling for three or four days. The day he came to the hospital "he ran high temperature, a rapid pulse, complained of an acute pain and was tender, with inflamed muscles," these signs being indicative of an abscess in process. He had him under treatment seven or eight days, but the infection continued. The abscess continued developing and on the seventh or eighth day he asked Dr. Ramos Oller to take charge of the patient.

On cross-examination: On December 1947, plaintiff was admitted in his hospital with an ailment in the back which was diagnosed as lumbago. The abscess operated on plaintiff was formed on the same side where he had suffered from lumbago. In his opinion there was no connection whatsoever between the two ailments. The abscess that had developed on plaintiff on February 1948, was not a secondary

infection. It could have been formed by external or internal causes and the person best fit to determine it was the surgeon who had operated.

Dr. Ramos Oller, after testifying on the treatment and operations to which plaintiff was submitted at Pavía Fernández Hospital, affirmed that the abscess which developed on plaintiff was the result of an infection produced by the colibacilli; that the colibacilli may only be introduced into said region of the body by external mechanical means such as a scratch, the prick of a needle or a nail, a wound or any other similar mechanical means. By virtue of these considerations and inasmuch as on February 18, 1948, plaintiff was given an injection in the sacral region, he inferred that the bacillus which caused the infection was carried into the lumbar region by the needle used by defendant in giving the injection. In his opinion the injection was given outside the sacral canal, for had it been given in the canal, the abscess of which plaintiff was operated would not have developed. He testified that although there might be a connection between the condition affecting plaintiff on December 1947 and the abscess which he had operated on him, he considered it improbable.

On cross-examination he affirmed that there was no need of making any culture to determine if the colibacilli was the cause of the infection, since the typical odor of that bacillus "indicated that it was the colibacillus which had penetrated in the infection." Inasmuch as the infection developed 48 hours after the injection had been given it was clear to him that said infection was carried by the needle to the infected region.

Defendant's evidence on this same point consisted of his own testimony, that of his helper, Carmen Cintrón and of Doctors Nelson Perea, Marshal Rockwell, José F. González, John Taylor and as surrebuttal again the testimony of Dr. Nelson Perea.

Defendant's testimony was to the effect that plaintiff was his patient on February 18, 1948. He complained of a pain "in the lower region of his back, and this pain radiated to the rear part of his left leg, on the hip." He examined him including his back and his leg, making also a blood test. He suggested a novocain injection in the sacral canal and upon plaintiff accepting he gave him the injection. Explaining the technique he used in giving him the injection he stated the following: "I placed him in a table face down, with his pelvis somewhat raised. Then I cleaned the skin with a soap solution. Then it was cleaned with ether and alcohol. And then three swabbings with tincture of metaphen were applied . . . when I was making the asepsis of the skin the nurse was sterilizing or boiling the special syringe and besides that I have (sic) in my hand a special needle." He further testified that the needle had boiled for 10 minutes and that when he prepared the injection he used "two solutions which come ready-made from the factory and guaranteed to be sterilized"; that after the injection "plaintiff remained in the table for a few minutes and after 10 minutes the anesthesia moved to his two legs, half anesthesia and half paralysis"; that he helped him together with nurse Cintrón to walk to a rest room in the clinic, where he stayed for about an hour and a half or two hours. Then he got up and went home.

On cross-examination: He has been in the practice of his profession in Puerto Rico for 25 years. He has treated an average of five or six sciatic cases per year. In the last two years he has had about 10 cases. As far as he knows no injection of the kind given to plaintiff, which he has given to other patients, have become infected. He again explained in detail the method used for plaintiff's asepsis when he injected him with novocain. Plaintiff is a stout man but the injection was not contraindicated for a man his weight. According to the medical history given to him by plaintiff,

he believed in the possibility of an infection of the kidney as an origin of the sciatica which he could prove by analyzing his blood test and by the subsequent examinations of plaintiff.

The testimony of Carmen Cintrón, the helper, was to the effect that on February 18, 1948, she helped in assisting plaintiff in her capacity as helper of Dr. Dunscombe, defendant; that she sterilized the instruments for 15 minutes, boiling them in a sterilizer which is continually operating; she boiled the two 20cc. syringes in the sterilizer and the needles used for the injection; she helped in the asepsis of the patient "I washed him from his waist down, below the coccyx, with a liquid-soap solution, then I applied ether, and then alcohol. I did it myself. Then I swabbed him thrice with tincture of metaphen." Once the needle and the syringe had boiled she carried them in a sterile tray. The doctor put on a pair of sterile gloves and started filling the syringes "in order to inject." After the injection plaintiff felt his feet numb and she helped defendant to take him to the rest room. Two and a half hours later plaintiff left.

Upon cross-examination: She has no title of auxiliary nurse, she has never taken the examinations. The first time she saw plaintiff was on February 18, 1948. Plaintiff is a strong man and defendant is old; she weighs 108 pounds, but in spite of that between her and Dr. Dunscombe, who is an old man, they could carry plaintiff from the stretcher to the rest room, at a distance of 20 meters.

Dr. Nelson Perea testified, briefly the following: In his opinion the lumbago suffered by plaintiff during December 1947, and for which he was treated in Pavía Fernández Hospital by applying 6 millions units of penicillin, had direct connection with the abscess which developed on the aforesaid plaintiff during February 1948. According to the blood and urine tests made on December 1947, and the ones subsequently made on February 1948, at that time the patient's condition had grown worse inasmuch as in December he had

one plus albumin in the urine and in February he had three plus, indicative that his condition had aggravated. Sciatica is always caused by a focus of infection localized some place in the organism. The abscess could not have been caused as a result of the novocain injection administered to plaintiff by defendant, inasmuch as said abscess developed in a region far from where the injection was given. The abscess was a secondary infection.

By order of the court he examined plaintiff on September 24, 1948. He has had experience giving caudal injections to obese persons and it is not difficult to inject them. If the injection is given in the sacral canal it produces the typical effect of the legs growing benumbed, "it produces a paralysis which sometimes lasts for one or two hours." The injection given to plaintiff on February 18 had no connection whatsoever with his ailment when he was hospitalized on the 21st of that month in Pavía Fernández Hospital. Had an abscess developed—as a result of said injection—it must have been a sacral abscess. Most of the perinephritic abscesses are due to the colibacillus. It reaches the kidney through the blood. The fact that plaintiff stopped receiving treatment on February 20 and the penicillin was suspended during the 21st and the 22nd of that same month contributed in aggravating his condition.

Upon cross-examination: The colibacillus normally inhabits in the colon but may be present in other places of the organism. The novocain injection is harmless, it is a sedative and it is not contraindicated in cases where the patient suffers from syphilis or albumin. If the injection is given outside the sacral canal and as a result thereof an abscess should develop, it would be localized superficially.

Dr. Marshal Rockwell stated the following: He is a physician specialized in orthopedic surgery. Abscesses are frequently formed as a result of trauma. To determine if a colibacillus is the cause of an infection no culture is needed.

In his opinion it is impossible for an abscess to develop in the lumbar region as a result of an injection given in the sacral canal. Abscesses in the lumbar region may be caused by infections in other parts of the body.

Upon cross-examination he stated that an infection in any part of the body "may be transmitted to any other part of the body."

Dr. José F. González testified as follows: He is a physician and surgeon, Director of the Betances Clinic of Mayagüez. In his opinion, according to the records of Pavía Fernández Hospital, plaintiff was suffering from a lesion in the kidney. He manifested kidney trouble from the date that he first came to Díaz García Hospital, about December 10, 1947. The abscess in the lumbar region could have caused the kidney trouble and the sciatica which defendant diagnosed, inasmuch as the latter is a "result of some focus of infection in any part of the organism." He stated that if an injection would be given outside the sacral canal, the surgeon would immediately notice it. The treatment given to plaintiff by Dr. Dunscombe was the correct and adequate one in a case like this. The determinative cause of the sciatica suffered by plaintiff on February 21 when he was hospitalized at Pavía Hospital was "an abscess in process in the lumbar region and which was the predisposing histological (sic) factor of the sciatica. A more or less chronic abscess . . ." which "probably had its origin in the first hospitalization when he complained of a pain here (pointing), and it improved, we could say that it lay dormant for a time and then when his defenses weakened and his strength diminished, the pus broke on the weakest point, through the lumbar region."

Upon cross-examination he reaffirmed his opinion that with the treatment in Pavía Hospital the abscess in process "improved or lay dormant," and that later, when his strength weakened, it appeared again. An infection may be trans-

mitted to a patient by the coat used by the doctor if it is not sterilized; likewise it may be transmitted through the hands if they have not been adequately disinfected. He has not had enough experience with the kind of injections administered to plaintiff. He has only put about three or four of these in his lifetime. He thinks it necessary to make a superficial physical examination before giving an injection for caudal anesthesia. It is not necessary to be a graduate nurse to take care of a patient when he suffers from a sciatical pain.

Dr. John Taylor's testimony was as follows: He is a physician and surgeon, specialized in orthopedy. Novocain is used in the community as a treatment for sciatica. A novocain injection is given in the sacral canal and it may also be given in the sciatic nerve. An injection given in the sacral canal has no connection with an abscess in the lumbar region. Abscesses caused by injections always— according to his experience—originate at the place where the needle is inserted. A deep abscess in the lumbar region "almost always proceeds from the blood or from the kidneys or it may be lymphatic."

Upon cross-examination he stated that in the occasions that he has used novocain in the treatment of sciatica, he has injected it directly in the sciatic nerve; he has never injected it in the sacral canal. For an infection to develop outside the sacral canal the injection has to be given outside of it.

On rebuttal plaintiff testified that nurse Carmen Cintrón never helped in his asepsis when he was injected. Defendant neither used gloves nor applied tincture of metaphen. He went to the rest room walking without anybody's help. He remained there for about 25 or 30 minutes. He never felt his legs becoming numb. Finally he testified that at the time he visited Dr. Dunscombe he was weighing 214 pounds.

Upon cross-examination he stated that although he was with his face down while he was given the injection, he could see anybody who would approach him. He had not felt that his skin had been disinfected before giving the injection.

Dr. Ramos Oller, also on rebuttal, testified as follows: An albumin plus is not a sign that the kidney is infected. A fever may result in three plus albumin. The abscess of which plaintiff was operated was not one of the kind known as perinephritic abscesses, inasmuch as it was located in the sacro-spinal muscle. In an infection of the kind suffered by plaintiff it is very difficult to determine which is its focus.

When Dr. Oller was cross-examined as to whether "it is common in the case of a deep infection to consider that it is always the result of an internal infection in the organism unless otherwise provided" he answered in the affirmative. He also answered affirmatively when he was asked if the lumbago suffered by plaintiff on December 1947 could have weakened the tissues of the lumbar region to the point of being propense to the development of an abscess due to an infection acquired through the blood stream.

Finally, Dr. Emilio Vadi Collazo testified that he has been in the practice of the medical profession in Puerto Rico for 28 years, 15 of them in the Municipal Hospital of the Capital. The technique used by defendant in giving the injection to plaintiff was incorrect. That "the modern concept of medicine is that the germs which are outside can only penetrate the body by having somebody put them there." The abscess developed on plaintiff due to the fact that the necessary steps for an adequate asepsis in giving him the caudal injection were not taken. The infection was produced by colibacillus transmitted through the aforesaid injection.

Upon cross-examination: He has given more than 1,600 injections as the one defendant gave plaintiff. The infection could have been transmitted through the blood stream and reach the region where the abscess developed.

As surrebuttal evidence defendant again offered the testimony of Dr. Nelson Perea. He testified that when he received an order from the court to examine plaintiff, he took an X-ray of the region where he was operated on. The X-ray did not indicate osteomyelitis of the sacrum, although "an osteomyelitis of the transversal process of the fourth and fifth vertebrae, but not of the sacrum" was evident. In one of the clinical records of Pavía Fernández Hospital of February 25, 1948, the following appeared: "Impression: Perinephritic abscess." An impression is, according to him a tentative diagnosis.

Upon cross-examination he stated that an impression is not a diagnosis.

We can not agree with appellant in that the trial judge erred in discarding Dr. Ramos Oller's conclusion that the infection was necessarily introduced into plaintiff's body by an infected needle when defendant gave him the caudal injection, and in holding that said conclusion was not supported by the evidence and that it was in contradiction with the testimony of said expert. Let us see how the trial court analyzed Dr. Ramos Oller's testimony. Said court stated the following:

"(1).—Although Dr. Ramos Oller did not make a culture of the bacillus which caused the infection suffered by plaintiff —the scientific way of ascertaining the nature or the identity of the bacillus—said doctor being the one who operated on plaintiff was best fit, as Dr. Nelson Perea testified, to determine the cause of the infection. We ought, therefore, to accept Dr. Ramos Oller's conclusion that the infection which produced the abscess was caused by the colibacillus inasmuch as this is a scientific question subject to determination by a medical expert.

"(2).—Dr. Ramos Oller's second conclusion was controverted by defendant himself and by his medical experts Doctors Nelson Perea, José F. González, John Taylor and A. Pérez Toledo, who testified that the colibacillus which is the normal habitant of the colon is often located in other parts of the body

such as the teeth and the tonsils and that from there they can pass to other parts of the body by the blood circulation system and also by way of the lymphatic system. Dr. Perea further testified that about 80 to 85 per cent of the kidney infections are colibacillosis and Dr. González testified that almost all kidney infections are caused by the colibacillus. Dr. Emilio Vadi, expert for plaintiff, testified that plaintiff's abscess could have been caused by a colibacillosis transmitted internally. Dr. Pavía Fernández, also an expert for plaintiff, who examined him in his hospital at San Juan, testified that an abscess as the one developed on plaintiff could have an internal cause. And Dr. Ramos Oller in his second testimony given on January 12, 1949, testified that when the infection is deep, if there is no local lesion it is inferred that the infection is internal; that plaintiff did not show any external sign of lesion. The evidence showed that the abscess in this case was deep and widely developed.

"We must conclude therefore, that besides the mechanical means spoken by Dr. Ramos Oller, the abscess could have also been the result of an internal infection in plaintiff's body. This conclusion is strengthened by the fact that already in December 1947, that is, two months after the operation, plaintiff was treated for a strong pain in the lumbar region and that penicillin and other medicines employed in the treatment of infections were administered. And it is made even stronger by the fact that when plaintiff visited defendant on February 18, 1948, he had a pain in a leg, unmistakable sign of a focus of infection. Dr. Perea's testimony that sciatica is always caused by a focus of infection in the organism and Dr. González' testimony that an abscess in the lumbar region may cause sciatica should be borne in mind. Remember also that the pain felt by plaintiff when he was treated on December 1947 was after suffering from a back sprain, and remember as well Dr. Rockwell's testimony to the effect that abscesses are often developed as a result of trauma.

"(3).—Dr. Ramos Oller's conclusion that the infection was necessarily introduced to plaintiff's body by the infected needle used by defendant finds no ground in the evidence and is in contradiction with the very testimony of said medical expert and we must therefore set it aside.

"We must admit that in this kind of actions, due to the technical nature of the questions involved, we must trust and rely on the testimony of medical experts to arrive at correct conclusions. Because as Aristotles said: That is so, however, when the opinion of the medical expert is limited to his science without invading the medical field.

"Therefore, when Dr. Ramos Oller was of the opinion that the abscess that he operated on plaintiff in the lumbar region was due to the presence there of the colibacillus, said medical expert set forth a scientific conclusion. Likewise, when said doctor stated that the colibacillus may only be carried to said region by mechanical means such as a scratch, the prick of a needle or a nail or a wound, although said opinion was disputed by the medical experts for defendant, he stated a scientific conclusion. However, when said witness concludes that the infection was necessarily carried to the region by the needle used by the defendant when he injected plaintiff on February 18, 1948, there being other means according to the expert himself, which could have caused the infection, it is clear that the witness went beyond the limits of scientific experience and invaded the field of personal speculations. It is so, because said witness did not say at any time that the only way the colibacillus could enter the region where the abscess developed was by means of a hypodermic needle. Contrariwise, he enumerated other mechanical means which could have caused the infection and he did not exclude the possibility that in the case at bar the infection could have been produced by said other means. It is clear that the opinion of Dr. Ramos is based on the fact that defendant had actually given an injection of caudal anesthesia to plaintiff in the sacral region. Had Dr. Ramos Oller not known said fact, was it possible that he should arrive at the sole conclusion that a hypodermic needle was the carrier, there being other possible means which he did not exclude scientifically? A negative answer is imperative.

"Should we accept this conclusion of the expert Dr. Ramos Oller, we would be violating the aforesaid principle that no presumption or inference whatsoever of negligence arises from the fact that the patient has been injured. If we conclude with said expert that due to the presence of an infection and due to the fact that defendant gave an injection in or near the

infected region to plaintiff, the injection was necessarily the cause of the infection, we would actually be applying the rule of *res ipsa loquitur* rejected by the jurisprudence in this kind of actions.

"Dr. Ramos Oller's testimony establishes evidence which is consistent with the hypothesis that the infection was caused by the needle used by defendant when he applied the caudal anesthesia on plaintiff. It also constitutes evidence which is consistent with the theory that it was not said needle but any other mechanical means such as the prick of a nail, scratching with the nails, or any other cut in the place, which transmitted said infectious bacillus to plaintiff's body. Said evidence thus produced is insufficient to support plaintiff's claim."

A court is not bound to follow blindly the opinion of an expert, especially when it is in conflict with the testimony of other experts. *Housing Authority* v. *Viera*, 72 P.R.R. 683; *León* v. *Industrial Commission*, 58 P.R.R. 905; *The People* v. *Bonelli*, 19 P.R.R. 65 and *The People* v. *Sutton*, 17 P.R.R. 327. In this case there was a conflict not only between Dr. Ramos Oller's testimony and the testimonies of the experts for defendant, but in addition, the testimony of the former, as the trial judge correctly points out, did not exclude other mechanical means which could have been the cause of the infection, and he accepted that when the infection is deep—a fact which was definitively established—if there is no local lesion, sign which plaintiff did not show, an internal infection must be inferred. Under these circumstances we do not see how it can be alleged that the trial judge erred in not adopting Dr. Ramos Oller's points of view with regard to the relation of cause and effect between the injection given to plaintiff and the development of an abscess in the sacro lumbar region, above all when evidently he gave no credit to plaintiff's testimony on the lack of adequate asepsis when the injection was given.

The second error assigned to the trial judge, which consisted in admitting the testimony of Alberto Velázquez

and of the other witnesses who, according to stipulation, would testify substantially the same, their testimony being demonstrative of treatment administered to them by defendant, for the same ailment suffered by plaintiff when he was examined by the former, lacks merits.

Defendant, after testifying upon direct examination that he had assisted plaintiff by using the same technique and treatment used in previous cases, when cross-examined by one of the attorneys for plaintiff, testified elaborately on said technique and treatment and on the number of cases that he had treated during the past ten or eleven years.

Assuming, without deciding, that Alberto Velázquez' testimony as well as that of the others who by stipulation it was accepted that their testimony would be the same as that of the former, would not be admitted in evidence,[1] those testimonies in nowise prejudiced plaintiff inasmuch as without any objection on his part defendant testified on said particulars being submitted to an elaborate cross-examination. On the other hand, the findings of fact of the trial

---

[2] On this particular Wigmore in 1 Wigmore on Evidence, 3d ed., § 67, p. 487, states:

"*Parties in Civil Causes: Skill of Defendant in Malpractice.* Where the action is for *malpractice of a physician* or other person engaging to use skill, the defendant's possession of due skill is usually *put in issue* under substantive law and the pleadings, and hence may of course be proved on the principle of §§ 70–79, *post*. But apart from this, and assuming that the question is whether he *did a particular act* involving unskilful or improper methods, it would seem that his habitual qualities, if properly evidenced by repute or otherwise (*post*, §§ 1621, 1987), were admissible as indicating his probable conduct; for it is a habit and training, rather than a moral trait, that is involved, and thus the principle of §§ 83, 92, *post*, should control, and not the Character-rule. There is, however, little useful authority on the point."

And he sets forth the following in § 83, pp. 512–13:

"*General Principle.* As indicating the likelihood of a person doing or not doing an act in question, his physical capacity (or lack of it), his technical skill (or lack of it), and his possession (or lack) of the appropriate means or tools, are usually of sufficient probative value to be admissible. The circumstances of each case usually make it clear whether one of these data is there relevant; and no more detailed rules

judge hinge primarily on the testimony of defendant himself and of his helper as to the technique and treatment employed in plaintiff's particular case and on the testimony of the experts who ratified the correctness of the means employed in said case, independently of the means that he had employed in the treatment of other patients.

The imputation of passion, prejudice and partiality assigned as third error by plaintiff is untenable. The evidence to which the trial judge gave credit and which serves as ground to his findings of fact is sufficient to support the judgment. The judgment, therefore, is not contrary to the facts, as appellant contends. Neither is it contrary to law. A physician is bound only to employ that degree of skill ordinarily possessed by practitioners generally under like circumstances in the locality in which he practices his profession. *Kichner* v. *Dorsey & Dorsey*, 284 N. W. 171 (1939); *White* v. *Moore*, 62 S. E. 2d 122 (1950); *Wilson* v. *Martin Memorial Hospital*, 61 S. E. 2d 102 (1950); Problems of Negligent Malpractice, 26 Virginia L. Rev. 919

---

need to be laid down, nor has any important controversy arisen over the relevancy of this species of evidence.

"The considerations that have led to exclusion of such facts in a few instances have usually been considerations affecting some other use or aspect of the evidence, with which the present use was confounded. Thus, the rules against the use of a party's character as evidence (*ante*, §§ 55, 64) have sometimes been thought to require exclusion of facts wrongly construed as equivalent to character. Again, the rule against using an accused person's specific misconduct to show character (*post*, § 193), and limiting such misconduct, when used to show intent, by strict conditions (*post*, § 300), may sometimes be thought to operate against the fact of possession of criminal tools or other means. The general impropriety of using against an accused person either character, or specific misconduct to show character, is so constantly in the mind of Courts that they occasionally ignore the possibilities of evidence from the present point of view, and, by a wrong construction of the purpose of the evidence, feel bound to apply to it exclusionary rules that have no concern with it. This much must be kept in mind as a key to rulings which are otherwise inexplicable and ought not to stand as precedents.

"As a general principle, then the *existence or lack of the physical capacity, skill, or means* to do an act is admissible as some evidence of the possibility or probability of the person's doing or not doing it."

(1940).[2] He is liable to his patient for damages only when he is negligent and fails to exercise requisite skill and care. In this aspect a malpractice case is not distinguished from an ordinary case of damages based on negligence.[3] The law accords the medical practitioner the presumption that he employed and administered the proper treatment, *Hanners* v. *Salmon*, 288 S. W. 307 (1926), there being no presumption of negligence whatsoever on the fact that the patient has been injured or that an unsuccessful result has attended the treatment of the patient by the physician. *Derr* v. *Bonney*, 231 P. 2d 637 (1951); *Bonnet* v. *Foote*, 107 P. 252 (1910). If after an operation or any other treatment an infection appears, it does not warrant the inference or presumption that there was negligence. *Tallon* v. *Spellman*, 19 N. E. 2d 33, 35 (1939); *Stacy* v. *Williams*, 69 S. W. 2d 697 (1934).

Negligence *per se* on the part of the doctor, is not sufficient to warrant recovery of damages. Once it is established that the doctor has been negligent, the plaintiff must show —as in other cases of negligence—that such negligence proximately caused injury. *Ewing* v. *Goode*, 78 F. 442 (1897); *Bowles* v. *Bourdon*, 219 S. W. 2d 779 (1949); *Newman* v. *Campbell*, 73 P. 2d 1265 (1937). See likewise Proximate Cause in Malpractice Cases, 13 A.L.R. 2d 11 (1950).[4]

The mere possibility that a doctor's negligence has been the proximate cause of injury, is not sufficient to establish

---

[2] The rule set forth is uniform in American jurisdictions. See 41 Am. Jur., Physicians and Surgeons, § § 78 and 82, pp. 197, 198, 200 to 202; 129 A.L.R. 108; 22 Tulane L. Rev. 537 (1948). In *Rojas* v. *Maldonado*, 68 P.R.R., 757 (1948) and *Carrasquillo* v. *Am. Missionary Association*, 61 P.R.R. 837 (1943), the direct professional liability that the facts herein show were not involved and other legal rules were applied.

[3] The authorities are in disagreement as to whether the cause of action exercised by plaintiff who alleges damages in his treatment is of an *ex contractu* or an *ex delicto* nature. See 22 Tulane L. Rev. 537; *Revista de Derecho Privado*, Vol. II, p. 143 (1923); Eduardo Benzo, *La Responsabilidad Profesional del Médico* (1944), Chapter IV, p. 107.

[4] The doctrine of *res ipsa loquitur* is not generally applied in malpractice cases. 162 A.L.R. 1265; 26 Virginia L. Rev., *supra*.

a malpractice case for negligence against a defendant; should there exist the possibility that other causes might have interfered, it is plaintiff's duty to exclude them, showing that the doctor's negligence was actually the proximate cause of injury. *Ramberg* v. *Morgon*, 218 N. W. 492 (1928) ; *Ewing* v. *Goode*, *supra;* Eduardo Benzo, *La Responsabilidad Profesional del Médico* (1944), p. 121.

In the case at bar plaintiff was far from proving that defendant did not employ the technique and treatment commonly used for his ailment when plaintiff visited him for the first time. The original diagnosis was correct, as it was proved even by the medical evidence introduced by plaintiff, who did not include any element whatsoever of negligence when defendant made his diagnosis. On the other hand, his case hinged on the theory that the abscess was subsequent to the caudal injection given in said occasion. On this particular, as well as on the alleged lack of asepsis, the evidence was conflicting, and the trial judge settled the conflict, not believing plaintiff's evidence that there was no adequate asepsis, and as to the expert's testimony, he considered that the deep abscess which required surgical attention in Pavía Fernández Hospital was not the result of an infection caused by the alleged lack of asepsis.

Under said circumstances we do not believe that the error assigned was committed and the judgment will be affirmed.